## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SUSANA C.,[1] | ) | |
| | ) | No. 20 CV 135 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| KILOLO KIJAKAZI, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | September 28, 2022 |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

Susana C. brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits.  Before the court are the parties' cross motions for summary judgment.  For the following reasons, Susana's motion is granted, the government's is denied, and the matter is remanded:

### Procedural History

Susana filed her application for benefits in March 2015 alleging disability beginning on July 4, 2010, because of back, right shoulder, and thyroid problems, as well as depression and anxiety.  (Administrative Record ("A.R.") 173-83.)  She sought and received a hearing before an administrative law judge ("ALJ") after her application was denied initially and on reconsideration.  (Id. at 36-69, 70-102, 105-06.)  Susana and a vocational expert ("VE") testified at a December 2016 hearing,

---

[1]  Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect her privacy to the extent possible.

(id. at 36-69), after which the ALJ ruled that Susana was not disabled, (id. at 16-30). The Appeals Council denied Susana's request for review. (Id. at 1-9.) Susana then sought judicial review of that decision in 2018. *See Susana C. v. Berryhill*, No. 18 CV 2100 (N.D. Ill.). But before the parties fully briefed the issues, the government elected to voluntarily remand its decision for further administrative proceedings, instructing the ALJ to reassess the medical opinion evidence and Susana's ability to understand and communicate in English. *Id.*, Dkt. No. 23 (Jan. 16, 2019). In August 2019 the ALJ held a second hearing at which Susana and another VE testified, (A.R. 938-70), but the ALJ again denied her application for benefits, (id. at 913-29). Susana then filed this action for judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 6).

## Background

### A.    December 2016 Hearing

Susana testified through an interpreter that she was born in Mexico, left school at age 14 to come to the United States, and understands little English. (A.R. 38-39, 44-45, 48.) She is right-handed and lives with her husband and daughter, who was 13 years old at the time of the hearing. (Id. at 43-44.) Susana worked as a machine operator, regularly lifting as much as 40 pounds, until she injured her right shoulder in 2009 and was placed on light duty. She received injections and underwent surgery that same year to treat her injury. (Id. at 45-47.) When she was still unable to work 18 months later because of her shoulder and

back pain, her employer terminated her employment. (Id. at 47.) Despite two years of searching, she could not find another job. (Id.)

Susana testified that although her shoulder surgery provided some relief, the pain—which emanates from the top of her shoulder, into her neck, and sometimes travels down to her arms and fingers—was "still bad." (Id. at 49.) She said it was "impossible" to reach in front with her right arm, she dropped things almost daily, and could only lift a partial cup of water. (Id. at 49-50.) Susana's medications relieved her pain "a little" but did not allow her to lift more weight, and she reported that she could not zip or button her clothing, or squeeze or drive with her right hand because of pain. (Id. at 44, 51, 55-56.)

Susana further testified that her back pain has worsened over time. She tried physical therapy and injections, but as with her shoulder pain, medication reduced but did not resolve her pain. (Id. at 51-52.) She explained that the pain starts in her back and travels down her right leg, limiting her to lifting only five pounds with her left arm. (Id. at 52-53.) Susana said she could sit for 15 minutes before needing to stand, "walk around a bit," and then sit or lie down, and that the pain increased "when [she] tr[ied] to do something." (Id.) As a result, she would lie down for about two hours each day. (Id.)

Susana stated that on a typical day during the 2013 to 2015 time period, she woke, dressed, and performed daily activities, taking breaks to sit or lie down. (Id. at 54-55.) She explained, for example, that she would try to "cook slowly" by alternating between sitting and standing and also drove her daughter to school. (Id.

at 54-56.) Sometimes Susana would lie down for hours because of pain or medication side effects. (Id. at 55.) Although a March 2015 treatment note indicated she had mopped the floor, Susana explained that she stopped after three or four minutes because of "sharp pain" in her back and arm, and that she became "very sick" and was given an injection. (Id. at 58.) As a result, her husband started doing the housework and, when her pain was "really, really sharp," he would use FMLA leave two or three times a month to help her get out of bed, use the bathroom, take a shower, and drive their daughter to school. (Id. at 52, 58-59, 62.) According to Susana, her pain would last three to four days, requiring her adult daughter to also help her. (Id. at 60-63.)

A VE described Susana's past work as being at the medium exertion level. (Id. at 64.) The ALJ then described a hypothetical individual of Susana's age, education, and work history with a residual functional capacity ("RFC") to: lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and/or walk for six hours; push and pull as much as she could lift and carry; and reach overhead with her right arm, balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolding occasionally. (Id.) The ALJ did not place limits on the hypothetical individual's ability to comprehend English. (Id. at 65.) The VE identified several light duty jobs this individual could perform if she could stay on task 90-95% of the time. (Id. at 64-66.)

Susana's attorney asked how the VE's answer would change if the individual also was limited to occasional reaching in front or handling on her dominant side

and would be off task more than 10 percent of the day once a week or absent two or more days per month. (Id. at 66-67.) The VE indicated that any of these additional limitations would preclude the jobs identified. (Id.)

## B.  August 2019 Hearing

The second hearing primarily concerned Susana's ability to understand English. Susana was 51 years old at the time of the second hearing. As for her previous employment, Susana testified through a translator that her sister-in-law completed the job application for her and that she was never interviewed before her hire. (A.R. 944-45.) She then explained that she learned her job in 30 days by watching a Spanish-speaking co-worker, (id. at 945-46), yet twice made mistakes because of her language barrier, (id. at 945-49). After her injury, Susana sought a job in which she could be trained in Spanish, take breaks, and switch between sitting and standing. (Id. at 950, 952-53, 955.) Unable to find such a job, Susana enrolled in an English class, but her medication side effects made it difficult to learn. (Id. at 949.)

The ALJ again posed hypotheticals to the VE, the first of which involved an individual of Susana's age, education, and work history with an RFC for light work and occasional reaching overhead with the dominant arm, balancing, stooping, kneeling, crouching, crawling, and climbing ladders, ropes, scaffolds, ramps, or stairs. (Id. at 960-61.) The VE stated that such a person could perform specific vocational preparation ("SVP") 2 jobs of assembler, inspector-hand packager, and sorter. (Id. at 961.) The VE added that the same jobs would be available to this

individual, as would racker, an SVP 1 job, even if the individual needed to learn her job through demonstrations with "very little" dialogue. (Id. at 961-63.)

The third hypothetical had the same limitations, except that in addition to learning through demonstrations, the job did not require knowledge of the English language. (Id. at 963-64.) The VE testified that she knew of at least one manufacturer that hired only Spanish speakers and that the four jobs she had identified would be reduced by no more than 50%. (Id. at 964-65.) The VE continued that if the same person were limited to lifting a maximum of 10 pounds, the inspector-packer jobs would be precluded, but the other three jobs would remain available in significant numbers. (Id. at 968.) However, the VE explained that the individual could not perform any of the four jobs identified if she was: limited to occasional reaching in all directions with her dominant arm or occasional standing for 15 minutes followed by five minutes of sitting, (id. at 967-68); absent more than 10 days per year, (id. at 969); or off task more than 10 percent of the day, (id.).

## C. The ALJ's Decision

The ALJ engaged in the standard five-step evaluation process, 20 C.F.R. § 404.1520(a),[2] concluding at step one that Susana had not engaged in substantial gainful activity during the relevant period. The ALJ then found at step two that Susana suffers from severe degenerative disc disease of the lumbar spine and right shoulder arthropathy, as well as non-severe thyroid disorder and depression. (A.R.

---

[2] Amendments to the Social Security regulations regarding the evaluation of medical evidence were published on January 18, 2017. 92 FR 5844-84 (Jan. 18, 2017). But because these amendments apply only to claims filed on or after March 27, 2017, references to the regulations in this opinion refer to the prior version.

916.)  At step three the ALJ concluded that Susana's impairments were not of listings-level severity, but that she was mildly limited in concentrating, persisting, or maintaining pace ("CPP").  (Id. at 916-18.)  Before turning to step four, the ALJ determined that Susana retained the RFC to perform light work but could only occasionally reach overhead with her right arm, balance, stoop, kneel, crouch, crawl, and climb ladders, ropes, scaffolds, ramps, or stairs.  (Id. at 918.)  She also limited Susana to work that could be learned through demonstrations or did not require English proficiency and would permit her to be off task 10 percent of the time.  (Id.)

In assessing the RFC, the ALJ explained that Susana's "statements concerning the intensity, persistence and limiting effects of [her alleged] symptoms" were "not entirely consistent with the medical evidence and other evidence in the record."  (Id. at 919.)  She gave "little" weight to orthopedic surgeon Dr. William Earman's opinion that Susana was limited to less than the full range of sedentary work because it was inconsistent with his own notes and the other exams and imaging in the record.  (Id. at 923.)  The ALJ also assigned "little" weight to physical therapist Kevin Bresnahan's September 2010 opinion that Susana was limited to sedentary work for similar reasons.  (Id. at 924.)  The ALJ gave no weight to orthopedic surgeon Dr. Robert Atkenson's 2011 opinions that Susana was unable to work using her right upper extremity, reasoning that he had not seen her since October 2011 and that his opinions were inconsistent with his own treatment notes. (Id. at 924-25.)  The ALJ also pointed out that December 2013 imaging of Susana's

shoulder showed "no tears," "a preserved joint space," and "no abnormalities other than early tendinitis." (Id. at 925.)

In contrast, the ALJ gave "great weight" to the opinions of state agency medical consultants Drs. Vidya Madala and Martin Lahr, who limited Susana to light work with only occasional climbing, balancing, stooping, kneeling, crouching, crawling, and reaching overhead with her right arm. She reasoned that while neither physician examined Susana, both had special knowledge of the disability program and rendered opinions that were consistent with the evidence, which did not reflect motor strength deficits or gait or neurological abnormalities before Susana's date last insured and only a small annular tear on October 2013 imaging. (Id. at 925.) The ALJ also found that the state consultants adequately accounted for Susana's shoulder issues because the imaging was similarly unremarkable. (Id.) With respect to Susana's mental impairments, the ALJ gave "little" weight to state agency psychological consultants Drs. Howard Tin and Darrell Snyder's opinions that there was insufficient evidence to assess these impairments because the records received later—including treatment notes from Susana's psychiatrist indicating that her conditions were well-controlled with medication, and mental status exams that did not reflect significant abnormalities—demonstrated that Susana's mental impairments were not severe. (Id. at 925-26.)

The ALJ concluded at steps four and five that Susana could not perform her past work and was unable to communicate in English, but that she was not disabled

because jobs existed in significant numbers that she could perform, as the VE explained at the hearing.  (Id. at 928.)

## Analysis

Susana argues that the ALJ erred by: (1) improperly weighing opinion evidence; (2) incorrectly assessing her RFC; and (3) rejecting her subjective symptom allegations.  (R. 18, Pl.'s Mem.; R. 27, Pl.'s Reply.)  When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and her decision has the support of substantial evidence, *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted).  This is a deferential standard that precludes the court from reweighing the evidence or substituting its judgment for that of the ALJ, allowing reversal "only if the record compels a contrary result."  *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted).  The court considers Susana's arguments in turn.

## A.    Opinion Evidence

Susana contends that the ALJ improperly weighed the opinion evidence, affording little to no weight to her treating providers, and great weight to agency consultants who reviewed only some records without examining her.  (R. 18, Pl.'s Mem. at 10.)  The court notes that a treating physician's opinion in cases filed before March 27, 2017, generally is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques"

and "not inconsistent with the other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quotation and citation omitted). Nevertheless, the Seventh Circuit "uphold[s] all but the most patently erroneous reasons" for discounting such an opinion. *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (quoting *Luster v. Astrue*, 358 Fed. Appx. 738, 740 (7th Cir. 2010)). As such, "[o]nce contrary evidence is introduced," that opinion "becomes just one piece of evidence," and the ALJ must analyze various factors in deciding the weight to afford it, if any. *Ray v. Saul*, 861 Fed. Appx. 102, 105 (7th Cir. 2021); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). Those factors include: the length, nature, and extent of the treatment relationship; frequency of examination; physician's specialty; types of tests performed; and consistency with and support for the opinion in the record. 20 C.F.R. § 404.1527(c). The court upholds an ALJ's decision to discount a treating physician's opinion after considering these factors if she "minimally articulated" her reasons. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

Susana's first complaint is that the ALJ improperly treated physical therapist Bresnahan's September 2010 functional assessment as an opinion rather than as objective evidence, arguing that it is "entirely comprised of signs and findings . . . following laboratory testing." (R. 18, Pl.'s Mem at 10-11.) However, that assessment reflects Bresnahan's observations of Susana's physical capabilities and complaints during testing, as well as his judgment on how well Susana could perform various activities throughout a workday. (A.R. 478-86.) That judgment constitutes an opinion because Bresnahan proposed that with regular breaks

Susana could sit for a full workday, stand a total of four hours in 30-minute intervals, walk two to three hours, and perform only sedentary work. (Id. at 480.)

Unlike a treating physician, a physical therapist is not an "acceptable medical source" under the law and his opinion is "not entitled to any special weight." *Rachel S. v. Saul*, No. 13 CV 8465, 2021 WL 2939975, at *8 (N.D. Ill. July 13, 2021) (citing SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006), and *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016)). But because physical therapists "tend to be consulted for chronic problems" and have "significant experience" assessing the ability to work, *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004), their reports "cannot be arbitrarily rejected," *Hamilton v. Colvin*, 525 Fed. Appx. 433, 439 (7th Cir. 2013). Further, the same factors applicable to treating physicians may be considered when evaluating physical therapists' opinions. SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2016); *see also Jorge B. v. Kijakazi*, No. 19 CV 4738, 2022 WL 1720449, at *6 (N.D. Ill. May 27, 2022) ("The regulation sets out six factors that an ALJ *must* consider in weighing 'acceptable medical source opinions,' § 404.1527(c), and *may* consider in weighing 'not acceptable medical sources' . . . depending 'on the particular facts' of the case.") (emphasis in original).

The ALJ considered some of the factors here, noting that Bresnahan is a physical therapist who examined Susana only once before limiting her to sedentary work. (A.R. 924.) The ALJ also reasoned that Bresnahan's opinion was inconsistent with Susana's clinical exams, which reflected normal motor strength, no sensory abnormalities or other neurological deficits in her lower extremities, and

"no stenosis, disc herniations or any other abnormalities other than a small annular tear as late as October 2013." (Id.) In giving more weight to the state agency physicians' opinions, the ALJ stated that unlike Bresnahan, they were "acceptable medical sources" with "specialized knowledge" of the disability program. (Id.)

While these reasons for discounting Bresnahan's opinion appear valid on their face, there are at least two defects in the ALJ's assessment. First, in discounting Bresnahan's opinion, the ALJ misstated it. Bresnahan opined that Susana could stand for four hours total in 30-minute increments and walk "moderate" distances for a total of two to three hours. (Id. at 480.) But the ALJ described Bresnahan's opinion as restricting Susana from "stand[ing] or walk[ing] for more than a total of two hours out of an eight-hour workday." (Id. at 924.) This was an error—and not one that the court can deem harmless. *See Quintana v. Colvin*, No. 15 CV 6417, 2016 WL 3752982, at *5-6 (N.D. Ill. July 14, 2016) (holding that ALJ who misstated opinion evidence failed to support its rejection with substantial evidence).

Second, in finding Bresnahan's opinion inconsistent with Susana's exams, the ALJ ignored the portion of his report reflecting objective evidence (i.e., testing) supporting his assessment. *See Stacy A. v. Berryhill*, No. 17 CV 6581, 2019 WL 1746207, at *6 n.2 (N.D. Ill. April 18, 2019) ("An FCE is objective evidence.") (citing *Hall v. Berryhill*, 906 F.3d 640, 643 (7th Cir. 2018)). Indeed, Bresnahan observed that Susana could stand for 35 minutes but had pain beginning after just 9 minutes as well as a "decreased" gait on her right side with an "arm swing." (A.R. 483.) He

12

further recorded that Susana could carry at most 6.4 pounds on her right side and 17.4 on her left, and lift a maximum of: (1) 10.4 pounds above her shoulders with both arms, 1.2 pounds with her right arm, and 7.8 pounds with her left; (2) 10.4 pounds from desk to chair and back with both arms, 3.4 pounds with her right, and 7.8 pounds with her left; and (3) 10.4 pounds from chair to floor and back with both arms. (Id. at 480-82.)

Susana's abilities, as observed by Bresnahan, fell below the RFC the ALJ assessed. *See Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995) (stating that "light work" involves walking or standing "for a total of approximately six hours of an eight-hour workday"); *see also* 20 C.F.R. § 404.1567(b) (indicating that light work "involves lifting no more than 20 pounds . . . with frequent lifting or carrying of . . . up to 10 pounds"). While the ALJ was not required to incorporate Susana's testing results into the RFC, she could not gloss over or ignore an entire line of evidence that ran contrary to her finding. *See* 20 C.F.R. § 404.1545(a)(3) (indicating that the RFC determination is "based on all of the relevant medical and other evidence"). Here, the ALJ failed to engage with this evidence, despite: (1) her finding that Bresnahan's assessment of Susana's testing performance was a "[v]alid representation of [her] capability level" and reflected Susana's "full effort," (id. at 485); (2) the VE's conclusion that certain standing limits would preclude the jobs she identified, (id. at 968); and (3) the regulatory requirement that if Susana had been limited to sedentary work, she would have been conclusively "disabled," 20 C.F.R. § Pt. 404 Subpt. P, App. 2, Rule 201.17 (a person who is over age 45,

illiterate, with unskilled past work and limited to sedentary work is disabled as a matter of law). On remand, the ALJ must reevaluate Bresnahan's opinions based on complete and accurate information, including the testing results. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ . . . cannot simply . . . ignor[e] evidence that points to a disability finding.").[3]

Susana also complains that the ALJ improperly weighed the opinions of Dr. Earman, who treated her regularly for years and opined that she could stand for 15 minutes at a time, walk and stand for less than two hours in a workday, and needed support from a cane. (A.R. 569.) Susana argues that the ALJ should not have described those opinions as inconsistent with the record when the ALJ in fact discounted them as lacking objective support. While an ALJ "may not base a decision solely on the lack of objective corroboration of complaints of pain," lack of objective support "is still relevant." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *see also* 20 C.F.R. § 404.1527(C)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). Regardless, the government counters that the overall objective record supports the

---

[3] The government also points out that Bresnahan's report was based on a single examination in September 2010. (R. 26, Govt.'s Resp. at 6.) But neither the government nor the ALJ contends that Susana's condition has shown lasting improvement, and the evidence suggests the opposite. (See, e.g., A.R. 54 (Susana's testimony that in 2013-2015 she was "feeling pain, but not as much as I'm feeling right now").) Moreover, the ALJ did not expressly rely on the report's age in discounting it. *See Abbott v. Astrue*, 391 Fed. Appx. 554, 558 (7th Cir. 2010) ("[W]e review the actual reasons given by the ALJ without speculating about what the ALJ might have considered.").

ALJ's RFC, pointing out as the ALJ did that Dr. Earman's treatment records during the relevant period do not reflect significant gait disturbances or need for a cane and instead show normal motor strength and only a mild abnormality in her back. (A.R. 923-24.)  In some respects, the parties' arguments on this point are two sides of the same coin.  What gives the court pause, however, is that the ALJ failed to sufficiently address Bresnahan's report, which is supported by Dr. Earman's opinions.  On remand, the ALJ must reevaluate these opinions in light of the totality of the evidence.[4]

Finally, Susana argues that the ALJ improperly afforded no weight to Dr. Atkenson's 2011 opinions that she was unable to use her right upper extremity. (R. 18, Pl.'s Mem. at 14-15.)  Susana argues that it was improper to reject Dr. Atkenson's opinions based on the date of last treatment (October 2011), because his opinions were relevant to at least the 15-month period in which he treated her.

---

[4] Susana also complains that the ALJ mischaracterized the record when analyzing Dr. Earman's opinions, citing evidence of positive straight leg tests, occasional radicular pain radiating to her lower extremities, and mononeuropathy in both arms. (R. 18, Pl.'s Mem. at 14.)  But Susana's attorney never mentioned her left shoulder or arm at either hearing. (See A.R. 1046 (representing that the "severe impairments that we're alleging are . . . the right shoulder, and [Susana's] lumbar spine").)  Furthermore, the ALJ recognized that some of Susana's straight leg raise tests were positive, (id. at 920, 921, 922), and that occasionally she experienced radiculopathy, (id. at 1062 (noting, however, that as of Susana's date last insured, her pain "didn't seem to be going from [her] back to [her] leg all the time")).  Susana further complains that the ALJ improperly afforded no weight to Dr. Earman's opinion that she could not work, arguing that while that generally is an issue reserved for the Commissioner, she could not "outright reject" Dr. Earman's opinion "without proper justification."  (R. 18, Pl.'s Mem. at 11, 13 (citing A.R. 923).)  But the ALJ examined Dr. Earman's opinions on Susana's functional capabilities and some evidence on which they were based.  In any event, the ALJ must reevaluate the opinion evidence on remand.

(R. 27, Pl.'s Reply at 8-9.)  The government responds that the ALJ did not find Dr. Atkenson's opinion compelling for any period, having concluded that it was inconsistent with other, later clinical examinations by other physicians and Dr. Atkenson's own treatment notes.  (R. 26, Govt.'s Resp. at 10-11.)  But in discounting Dr. Atkenson's opinions, the ALJ stated that Dr. Atkenson did not record any right shoulder weakness, (A.R. 924-25), when he and others did so on multiple occasions post-surgery, (see, e.g., id. at 308 (February 2010 treatment notes reflecting the same), 305-06 (April 2010 treatment notes reflecting "complaints of weakness"), 301 (July 2021 treatment note reflecting reports of "persistent right arm burning, pain and weakness" and recommending surgery)).  The ALJ does not identify any other inconsistency or evidence of marked improvement and, as discussed, Bresnahan's testing supports greater weakness than the RFC reflects.  Accordingly, remand is appropriate on this ground too.

## B.    RFC Assessment

Susana next complains about the ALJ's RFC assessment.  In determining the RFC, the ALJ must "evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling."  *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009).  Susana first contends that the ALJ's decision to exclude walking or standing limits in her RFC lacks the support of substantial evidence.  (R. 18, Pl.'s Mem. at 22-23.)  She points out that both she and her daughter testified about her limitations in this regard, including that Susana could only walk for 10 minutes before needing to rest

and that it was difficult for her to stand for long periods.  (R. 18, Pl.'s Mem. at 22 (citing A.R. 222, 225, 417, 483, 857).)  Additionally, Dr. Earman noted her difficulty standing after 10-15 minutes, and Bresnahan rated her ability to remain standing as "fair," indicating that she reported pain after standing for just nine minutes and stopped activity to sit after 33 minutes.  (Id.)  The government responds that Susana improperly asks the court to reweigh the evidence.  (R. 26, Govt.'s Resp. at 23.)  But as explained, the ALJ failed to consider evidence favorable to Susana on this point and discounted opinions without the benefit of the same.  The ALJ must revisit the RFC issue on remand.

Susana also complains that the ALJ did not "provide a proper basis for the severity of [Susana's] mental impairments" or account for their impact on the RFC, noting that "even minimal limits may be work preclusive."  (R. 18, Pl.'s Mem. at 22.) She points out that while the ALJ determined that she was mildly limited in all four areas of mental functioning after the first hearing, the ALJ concluded that she was mildly limited in just one—CPP—after the second hearing yet failed to explain this change.  (Id. at 19 (comparing A.R. 19-20 with A.R. 916-17).)  The court agrees that the ALJ's most recent analysis largely mirrors the initial one and relies on the same evidence.  The government is silent on this point, but the court cannot ignore it.  To be sure, an ALJ is not required to account for a mild limitation in a single area of mental functioning with a non-exertional limitation, but it takes no great leap of logic to conclude that the more areas affected, the more likely such a limitation might be warranted.  Even if the ALJ determines otherwise, she must

explain why. *See Simon-Leveque v. Colvin*, 229 F. Supp. 3d 778, 787 (N.D. Ill. 2017) ("While a mild . . . limitation in an area of mental functioning does not *necessarily* prevent an individual from securing gainful employment, the ALJ must still affirmatively *evaluate* the effect such mild limitations have on the claimant's RFC.") (emphasis in original) (internal citations omitted). Here, the ALJ suggests that no limitation need be assessed because Susana's mental impairments were "non-severe." (See A.R. 27, 925-26 (ALJ's RFC analyses indicating that there was "sufficient evidence to assess the claimant's mental impairments and [the ALJ] finds they were nonsevere prior to the claimant's date last insured").) But non-severe impairments also warrant consideration in the RFC, so this is no basis for exclusion. *Villano*, 556 F.3d at 563.

Another complaint Susanna lodges is that the ALJ did not rely on or procure opinion evidence regarding her mental impairments or inquire about them at her hearings, arguing that in rejecting the only expert opinions the ALJ impermissibly created an "'evidentiary deficit' she then filled with her own lay opinion," citing *Suide v. Astrue*, 371 Fed. Appx. 684 (7th Cir. 2010)). (R. 18, Pl.'s Mem. at 20-21.) But those opinions found insufficient evidence to support Susana's claims, (see A.R. 74, 85-86), and *Suide* held only that an ALJ could not fashion an RFC without evidence to support it, *see Suide*, 371 Fed. Appx. at 689-90 (noting that it was "not the ALJ's evaluation of [the physician's] reports that requires a remand," but rather that "[t]he rest of the record simply d[id] not support the parameters included in the ALJ's [RFC] determination"). The ALJ cited evidence to support her conclusion

that Susana's depression was not severe. Nevertheless, on remand, the ALJ should review the evidence anew and consider whether to consult an expert on the subject.

Finally, Susana complains that the ALJ failed to explain how she determined that Susana would be off task for just 10 percent of the day. (R. 18, Pl.'s Mem. at 19.) The government responds that Susana points to nothing that "demands the conclusion" she would be off task for longer. (See R. 26, Govt.'s Resp. at 23.) Maybe not. But the ALJ must articulate the reasons for her assessment. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (holding that an ALJ must "sufficiently articulate [her] assessment of the evidence" to "enable [the court] to trace the path of the ALJ's reasoning"). And while the ALJ stated that she assigned this limit "in light of [Susana's] reports of chronic pain in her back and shoulder," (A.R. 927), she did not explain how she arrived at that number. Nor can the court glean the answer from the record because the reference to 10 percent appears only when the ALJ asked the VE for the "ceiling" on the "tolerance for off-task conduct" in the jobs she identified. (Id. at 969.) On remand the ALJ must explain the bases for her new determinations regarding Susana's mental functional limits (or lack thereof) and her off-task determination. *See Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017) (remanding where ALJ "made no effort to build an accurate and logical bridge" between the evidence and the 10% off-task limitation she assigned to the claimant); *James v. Colvin*, No. 13 CV 3685, 2014 WL 3558743, at *7 (N.D. Ill. July 18, 2014) (remanding where the court "ha[d] no idea why the ALJ chose 4%" off-task time "and the decision [wa]s silent on this issue"). The ALJ also should consider

any impact that Susana's mental impairments may have on her ability to remain on task.

## C.     Subjective Symptom Assessment

Finally, Susana challenges the ALJ's finding that her subjective symptom statements were "not entirely consistent with the medical . . . and other evidence in the record." (A.R. 919.)  An ALJ's symptom evaluation is generally entitled to great deference because she can observe the claimant's credibility firsthand.  *See Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014).  As such, a court will not disturb that evaluation if it is logically based on specific findings and evidence and not "patently wrong"—that is, as long as it does not "lack[] any explanation or support."  *Id.* at 815-16 (citing *Elder*, 529 F.3d at 413-14.   In considering a claimant's subjective symptoms, an ALJ assesses the objective medical evidence alongside the claimant's daily activities, medication, treatment, or other methods used to alleviate symptoms, and factors that precipitate and aggravate pain.  SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529, 416.929(c)(3).

Susana complains that the ALJ improperly discounted her symptom allegations based on an alleged lack of objective evidence supporting her allegations.  (R. 18, Pl.'s Mem. at 16-17.)  Susana is correct that a claimant's "testimony cannot be disregarded simply because it is not corroborated by objective medical evidence."  *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015).  But more than that, and as discussed, the ALJ glossed over or ignored objective evidence.  The ALJ's analysis thus relied on "impermissibly cherry-picked" evidence, and her

decision to discredit Susana on that basis is unsound. *See Annette S. v. Saul*, No. 19 CV 6518, 2021 WL 1946342, at *11, *14 (N.D. Ill. May 14, 2021) (remanding in part because the ALJ only analyzed the objective evidence that supported his credibility determination).

Nevertheless, "[n]ot all of the ALJ's reasons [for discounting a claimant's symptom allegations] must be valid as long as *enough* of them are." *Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009) (emphasis in original). The problem here is that not enough of the reasons are valid. Indeed, the ALJ also discounted Susana's allegations based on a flawed analysis of her daily living activities. (R. 18, Pl.'s Mem. at 18-19.) Generally, an ALJ must consider daily living activities "with care," *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013), because a claimant's "ability to struggle through" them "does not mean that she can manage the requirements of a modern workplace," *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). As such, "[i]f an ALJ finds that a claimant's activities of daily living are inconsistent with her subjective allegations, the ALJ must identify [1] which particular activity of daily living contradicts a particular subjective allegation and [2] the contradiction." *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

The ALJ here pointed to a single treatment note from October 2014 to support her conclusion that Susana was "able to carry out some of her daily activities" and to refute Susana's claim that she could not lift more than five pounds. (See A.R. 926 (citing id. at 362).) Neither the ALJ nor the treatment note identifies Susana's activities. Furthermore, the note reflects that pain and

restricted range of motion in Susana's back "restrict[ed] many of her daily activities"—a point the ALJ failed to mention. (Id.) Other notes, Susana's testimony, and her daughter's third-party function report support similar limitations. (See, e.g., id. at 950 (Susana's August 2019 hearing testimony that she "tried to do mopping, but . . . couldn't" because "[r]ight away" she was "overcome by a very bad pain in [her] back"), 220 (Susana's daughter's June 2015 third-party function report indicating among other things that Susana "can't clean, cook, brush her hair" and does not "go out at all anymore"), 394 (Dr. Earman's October 2013 treatment note indicating low back pain "[c]ontinue[s] to restrict [Susana's] daily activities"), 402 (Dr. Earman's May 2013 treatment note indicating Susana "is continuing to have weakness and just general difficulty in doing her daily activities"), 423 (Dr. Earman's October 2011 treatment note reflecting that Susana "has been trying to increase her activities but they are restricted" by pain), 440 (Dr. Earman's December 2010 treatment note stating that back, buttock, and hamstring pain restrict Susana's activities).)

"An ALJ cannot disregard a claimant's limitations in performing household activities." *Moss*, 555 F.3d at 562. Nor may she cherry-pick the evidence that supports a non-disability finding. *Denton*, 598 F.3d at 425. Because the ALJ did both, her daily living activities and subjective symptom analyses lack the support of substantial evidence. *See Annette S.*, 2021 WL 1946342 at *11 (holding that ALJ's subjective symptom analysis was patently wrong "because at least two of the three reasons for discrediting [the claimant] were unsound").

## Conclusion

For the foregoing reasons, Susana's motion for summary judgment is granted, the government's is denied, and the matter is remanded for further proceedings consistent with this memorandum opinion and order.

ENTER:

**Young B. Kim**
**United States Magistrate Judge**